## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 16 2015, 6:27 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

William Byer, Jr.
Byer & Byer
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.B. (Minor Child),

and

S.B. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

October 16, 2015

Court of Appeals Case No.
48A02-1503-JT-200

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

Trial Court Cause No.
48C02-1410-JT-66

**Crone, Judge.**

# Case Summary

[1]     S.B. ("Mother") appeals the trial court's termination of her parental relationship with her two-year-old son J.B. She first challenges the trial court's denial of her oral motion for continuance on the day of the final hearing. She also submits that the trial court erred in ordering the termination of her relationship with J.B. Finding that the trial court acted within its discretion in denying Mother's last-minute motion for continuance and did not clearly err in finding that clear and convincing evidence supported the termination of the parent-child relationship, we affirm.

# Facts and Procedural History

[2]     On January 15, 2013, Mother gave birth to J.B.[1] In September 2013, the Department of Child Services ("DCS") opened an investigation after receiving a report that Mother was using marijuana in J.B.'s presence and that she failed to attend to his severe, bloody diaper rash. Rather than seeking medical attention for J.B., Mother left him with his paternal great uncle and aunt (collectively "Great Uncle"). That same day, DCS filed a petition alleging J.B. to be a child in need of services ("CHINS"). Mother, age seventeen at the time, had herself been designated a CHINS in a separate proceeding concerning her father.[2] At

---

[1]  J.B.'s father signed a voluntary consent to adoption and is not participating in these proceedings.

[2]  The CHINS proceedings concerning Mother were dismissed when Mother turned eighteen.

the initial hearing on the CHINS petition, the trial court removed J.B. and placed him in relative placement with Great Uncle. Mother admitted to the CHINS allegations, and the trial court designated J.B. a CHINS. The court ordered Mother to participate in the following: supervised visitation; substance abuse and psycho-parenting/family assessments and treatment; individual and family therapy; parenting classes; and random drug testing. She also was ordered to maintain safe, suitable, and stable housing, a legal source of income, and weekly contact with DCS. Mother failed to attend a meeting scheduled to discuss implementation of the reunification permanency plan, and the court found her noncompliant with supervised visitation, substance abuse treatment, and home-based therapy.

[3] In October 2014, DCS filed a verified petition for involuntary termination of Mother's parent-child relationship with J.B. Mother failed to appear for the November 2014 initial hearing. Notice of the February 2015 termination hearing was perfected by publication in the local newspaper in January 2015. Mother appeared at the hearing, having indicated that she had received the published notice. At the beginning of the hearing, she orally moved for a continuance on the grounds that she and counsel had not been in contact and therefore were unprepared to proceed. The trial court denied the motion, and counsel questioned witnesses on Mother's behalf. The trial court requested proposed findings of fact from the parties and on March 3, 2015, issued findings of fact and conclusions thereon in an order terminating Mother's relationship

with J.B. Mother now appeals the trial court's termination order. Additional facts will be provided as necessary.

# Discussion and Decision

## Section 1 – The trial court acted within its discretion in denying Mother's last-minute oral motion for continuance.

[4] Mother challenges the trial court's denial of her oral motion for continuance made on the morning of the termination hearing. The decision to grant or deny a motion for continuance is within the sound discretion of the trial court. *J.P. v. G.M.*, 14 N.E.3d 786, 789 (Ind. Ct. App. 2014). We will reverse only for an abuse of that discretion. *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*. An abuse of discretion occurs where the trial court reaches a conclusion that is clearly against the logic and effect of the facts or the reasonable and probable deductions that may be drawn therefrom. *J.P.*, 14 N.E.3d at 790. Where the trial court denies a motion for continuance, an abuse of discretion will be found if the moving party has demonstrated good cause for granting the motion. *Rowlett*, 841 N.E.2d at 619; *see also* Ind. Trial Rule 53.5 (stating that trial court has discretion to grant continuance on motion and continuance "shall be allowed upon a showing of good cause established by affidavit or other evidence."). No abuse of discretion will be found where the moving party has not shown that she was prejudiced by the denial of her continuance motion. *J.P.*, 14 N.E.3d at 790.

[5] Mother characterizes the denial of her motion for continuance as a denial of her due process rights. When the State seeks to terminate parental rights, it must do so in a fundamentally fair manner that meets due process requirements. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011). Due process affords parents the opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* The United States Supreme Court addressed the due process requirement in connection with requests for continuance in *Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964), reasoning,

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrawise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request was denied.

[6] Here, both Mother and counsel were present for the final hearing. She requested a continuance at the beginning of the hearing, asserting that she had not met with counsel until that morning and that counsel therefore had no time to prepare. In fact, she had not been in contact with counsel for eight months. She had already failed to appear for the initial termination hearing, and when the trial court asked her about her failure to appear or maintain contact with counsel, she simply stated that she had no telephone numbers or transportation.

She admitted that she had received notice by publication several weeks before the final hearing, yet she made no effort to contact counsel or DCS or even telephone the court to find out how to reach them. On the morning of the final hearing, DCS, witnesses, and court personnel were present and prepared to proceed. In contrast, Mother reappeared after a lengthy hiatus and was unprepared to proceed. Her failure to maintain contact with counsel for such a protracted period leading up to the final hearing shows that she had little interest in assisting in the preparation and presentation of her case. Simply put, she has failed to demonstrate any prejudice stemming from the trial court's ruling. Based on the foregoing, we conclude that the trial court acted within its discretion in denying her last-minute request for continuance.

## Section 2 – The trial court did not clearly err in terminating the parent-child relationship between Mother and J.B.

[7] Mother challenges the sufficiency of evidence supporting the trial court's judgment terminating her parental relationship with J.B. When reviewing a trial court's findings of fact and conclusions thereon in a case involving the termination of parental rights, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We will set aside the trial court's judgment only if it is clearly erroneous. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We neither reweigh evidence nor judge witness credibility. *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*.

Rather, we consider only the evidence and inferences most favorable to the judgment. *Id.*

[8]     In *Bester*, our supreme court stated,

> The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. Indeed the parent-child relationship is one of the most valued relationships in our culture. We recognize of course that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.

839 N.E.2d at 147 (citations, quotation marks, and alteration omitted).

[9]     To obtain a termination of the parent-child relationship between Mother and J.B., DCS was required to establish in pertinent part:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> ….
>
> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[10]     In recognition of the seriousness with which we address parental termination cases, Indiana has adopted a clear and convincing evidence standard. Ind. Code § 31-37-14-2; *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied.* "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citation omitted).

[11] Here, Mother generally asserts that DCS failed to prove each allegation in its petition for termination. However, she presents cogent argument only with respect to the following statutory elements: (1) that there is a reasonable probability that the conditions that led to J.B.'s removal will not be remedied; and (2) that there is a reasonable probability that continuation of the parent-child relationship poses a threat to J.B.'s well-being.[3] Because the statute plainly states that DCS need establish only one of the foregoing, we limit our discussion to the former.

[12] When assessing whether there is a reasonable probability that conditions that led to a child's removal will not be remedied, we must consider not only the initial basis for the child's removal but also the bases for continued placement outside the home. *A.I.*, 825 N.E.2d at 806. Moreover, "the trial court should judge a parent's fitness to care for [her] children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. "Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id*. For example, the court may properly consider evidence of a parent's substance abuse, criminal history, lack of employment or adequate

---

[3] Mother has waived any challenge to the remaining statutory elements for failure to present a cogent argument with citation to authority pursuant to Indiana Appellate Rule 46(A)(8). *See A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 n.4 (Ind. Ct. App. 2013) (noting that where parent fails to raise specific, cogent argument challenging trial court's conclusions concerning certain elements of Ind. Code § 31-35-2-4, those challenges are waived on appeal), *trans. denied*.

housing, history of neglect, and failure to provide support. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). In making its case, "DCS need not rule out all possibilities of change; rather, [it] need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[13] Here, the trial court issued extensive findings of fact. Mother has not specifically challenged any of those findings but instead makes general assertions referencing her reasons for failing to attend visitation, maintain contact with DCS, or complete the ordered services. As such, we are left to determine whether the unchallenged findings support the judgment. As they concern the reasonable probability of unremedied conditions, the unchallenged findings include the following:[4]

> 4. On or about September 16, 2013, the Child and Mother became involved with the DCS when the DCS investigated a report that Mother was using marijuana in front of the Child and had allowed a diaper rash to become so severe that the Child was bleeding;
>
> 5. Instead of seeking medical attention for the Child herself, Mother left the Child with Great Uncle and was briefly unable to be reached after DCS became involved;
>
> ….
>
> 7. At the time of the filing of [the CHINS] petition, Mother was

---

[4] To the extent that the findings include proper names for Mother, J.B., and Great Uncle, we have removed those designations.

seventeen (17) years old.

….

22.  At the November 26, 2014 initial hearing, Mother failed to appear without contacting the Court, her counsel, or DCS;

23.  Service by Publication was perfected on Mother January 25, 2014;

24.  Between the first Dispositional Order entered on November 6, 2013 and the Fact-Finding Hearing on February 17, 2015, Mother has failed to comply with the case plan in the following ways:

> a. Once Mother turned eighteen (on May 30, 2014), she completely stopped complying with Individual Counseling as ordered;
>
> b.  Mother was closed out of visitation four separate times;
>
>> i.  Since May 2, 2014, Mother has only visited the Child a total of five times;
>>
>> ii.  Three of those visits were not on her own visitation referral, as Mother would come visit the Child during times scheduled for the Child to visit with his Maternal Grandfather, and
>>
>> iii.  The last time Mother visited Child was December 9, 2014, which was only her fifth visit in a period of seven months;
>
> c.  Mother was closed out of home based services for non-compliance and is currently not participating;
>
> d.  Mother did complete the substance abuse assessment, but she did not follow up with the recommendations for treatment that the assessment provided for;

e.  When she could be found, Mother did submit to random drug screens, but each drug screen administered by DCS throughout the underlying CHINS matter returned positive for illegal substances;

f.  Mother did not complete parenting classes as ordered;

g.  Mother did complete the psycho-parenting evaluation but did not comply with the recommendations stemming from that evaluation;

h.  Mother never provided the Court or DCS proof of a legal income as ordered;

i.  Mother did not keep in regular contact with DCS or notify DCS of a change in address or household composition;

    i.  Once Mother turned eighteen on May 30, 2014, she left her Father's home and did not inform DCS of each new address she lived in,

    ii.  Testimony at the fact-finding hearing indicated at some point Mother began living with a boyfriend and his mother, and DCS was not informed of this address, and

    iii.  FCM [Family Case Manager] Bridget Bramlett, who was assigned the case after FCM Allbee was promoted, only spoke with Mother one time, on September 3, 2014;

        1.  Mother told FCM Bramlett that she "did not have time for this" and never spoke with DCS between that point and the Fact-Finding Hearing on February 17, 2015;

25.  No documentation was given to DCS, the Court, or Mother's counsel to show she had sought these ordered services out on her own;

26. Michelle Allen, Mother's therapist, testified that she treated Mother for Anger and Aggression Issues between September 2013 and May of 2014;

   a. These anger and aggression issues affect Mother's interaction with nearly everyone in her life, including her relationship with the Child;

   b. Michelle Allen testified that only towards the end of this period did Mother begin to commit to the therapy, which was necessary for true improvement,

   c. However, once Mother turned eighteen, she stopped visiting Michelle Allen and was closed out of the therapy services;

   d. Michelle Allen believes that without these issues being addressed, it would be harmful for Child to be cared for by his Mother,

   e. This was confirmed by Michelle Allen when she read a visit report detailing a visit between Mother and Child that stated Mother covered her ears and stated she could not handle Child crying;

27. When asked, Mother could not articulate how she planned to provide Child with a stable life and home environment;

   a. Mother testified that she does not have a job, is currently pregnant, and living with a boyfriend who has a criminal record;

28. Mother's compliance with the case plan and dispositional orders can be summed up as such:

   a. Before Mother turned eighteen on May 30, 2014, she was intermittently visiting the child, intermittently participating in court ordered services, and consistently using illegal substances;

b. After Mother turned eighteen on May 30, 2014, she disappeared for long stretches of time, visited with the Child only five times, did not make any contact with service providers other than visitation workers, and only spoke with DCS one time;

i. In fact, DCS had to publish Mother's summons to the fact finding hearing.

ii. Mother testified she saw the summons in the local newspaper about 1 month before the February 17 2015 Fact Finding date, and

iii. At no point after becoming aware of the hearing did Mother contact DCS, her attorney, or the Court;

29. The Child has been in relative placement with a paternal aunt and uncle since September 13, 2013 [age eight months];

30. The Child's relative placement has since provided support, care, guidance, and supervision in the absence of the same from the Mother for approximately seventeen (17) months;

….

38. Each of the above paragraphs is expressly adopted as the Court's own finding of fact. Each paragraph, independently and cumulatively, demonstrates this Court's finding that there is a reasonable probability that the conditions that resulted in the Child's removal from the home of the biological Mother will not be remedied, or that continuation of the parent-child relationship poses a threat to the well-being of the Child[.]

Appellant's App. at 73-83.

[14] Here, Mother's participation in services was intermittent at best. Even when she completed certain services such as the parenting assessment and psycho-

parenting and substance abuse evaluations, she did not comply with the recommendations for treatment and follow-up services. She was closed out of home-based therapy for noncompliance. Her therapist indicated that she had anger and aggression issues that affect her relationships with everyone in her life and that, left untreated, could prove harmful to J.B. Once Mother turned eighteen and left her father's home, she basically went incommunicado and failed to maintain contact with DCS or participate in services. Sadly, the only pattern with which she maintained consistency was her drug use, having tested positive for illegal substances each time she could be located and screened. She failed to complete parenting classes and was closed out of visitation four times. She had visited J.B. only five times in the nine months preceding the final hearing and had ceased all visitation as of two months preceding that hearing. She also failed to provide proof of legal income and stable housing. As a whole, the unchallenged findings show Mother's pattern of failing to earnestly commit to spending time with J.B. *See Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (failure to exercise right to visit one's children demonstrates lack of commitment to complete actions necessary to preserve parent-child relationship), *trans. denied*.

[15] J.B. was removed from Mother based on Mother's drug use and ensuing neglect of his health and medical needs. Although Mother initially took some positive steps by submitting to the required evaluations and assessments, she did not maintain her progress due to her inability to refrain from unhealthy conduct in her own life. In other words, she could not build a consistent, positive

relationship with J.B. because she could not establish consistent, positive patterns in her own life. Instead, she continued to use illegal drugs and, at the time of the final hearing, was pregnant again and living with a boyfriend who uses marijuana and has a criminal record. This simply does not bode well for her prospects of remedying the conditions that led to J.B.'s removal. "[A] trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro*, 842 N.E.2d at 372.

[16] Finally, Mother claims that the trial court's concluding remarks are inconsistent with its ultimate decision to terminate her parental rights:

> THE COURT: … I understand and I sympathize and I'm sorry you've had a very tough childhood and you're still very young and *hopefully, you know, things are going to turn around for you. It looks like maybe you've got a chance here if you take advantage of it.* But having said that, I also need to look at what's best for this child that is born now. And even looking at that, maybe what's best for your unborn child at this point. So I am going to take all of that into consideration when I make my decision.

Tr. at 49-50 (emphasis added). Read in context, we believe the trial court's second chance reference pertained to Mother's unborn child and, as such, do not find it inconsistent with the trial court's ultimate decision to terminate her parent-child relationship with J.B. Even so, we note that our standard of review requires that we determine whether the unchallenged *findings of fact* support the trial court's conclusions thereon. As discussed, we conclude that they do. Like

the trial court, we are sensitive to Mother's young age and tumultuous upbringing, having been designated a CHINS herself. Yet, we are also mindful that she made the majority of her progress toward reunification with J.B. *before* she turned eighteen and left her father's home. Based on the foregoing, we conclude that the trial court did not clearly err in determining that there is a reasonable probability that the conditions that led to J.B.'s removal will not be remedied. Accordingly, we affirm its termination order.

[17] Affirmed.

May, J., and Bradford, J., concur.